UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GENE CROOK,

            Plaintiff,                      Case No. 05-60176

vs.

                                  HONORABLE JOHN CORBETT O'MEARA
                                  HONORABLE STEVEN D. PEPE

COMMISSIONER OF SOCIAL SECURITY,

            Defendant.

_____/

**REPORT AND RECOMMENDATION**

Gene A. Crook brought this action under 42 U.S.C. § 405(g) in order to challenge a final decision of the Commissioner denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. Both parties have filed motions for summary judgment, which have been referred pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C). For the following reasons, IT IS RECOMMENDED that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED.

I.      BACKGROUND AND FACTS

      A.      PROCEDURAL HISTORY

Plaintiff applied for DIB on April 23, 2002, alleging he was disabled as of June 30, 2001. (R. 15, 45). After Plaintiff's application was initially denied, a March 26, 2004, hearing was held before administrative law judge ("ALJ") Larry A. Temin, who issued a decision on April 9,

2004, finding Plaintiff not to be entitled to a period of disability. (R. 28 - 31, 12 - 21). On June 3, 2005, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. (R. 4 - 6).

In this action, Plaintiff seeks benefits from the date of his 55th birthday on May 6, 2003, or in the alternative, from November 24, 2004, the date of an examination by Plaintiff's treating physician, who stated that the Plaintiff's condition had worsened since January 2003. (Plaintiff's Motion for Summary Judgment, Ex. A, Dkt. #11, Attachment 2).[1]

### B.   PLAINTIFF'S HEARING TESTIMONY

At the time of his hearing before ALJ Temin on March 26, 2004, Plaintiff was 55 years old. He was represented by counsel and testified that he had not worked since June 30, 2001. (R. 166 - 167). He had been previously employed at the Operating Engineers since 1977, working as a Crane Operator since 1989, on occasion operating a forklift. (R. 167 - 168). He testified that he is drawing a disability pension and has health insurance from Operating Engineers. (R. 166 - 167). Plaintiff is 5' 8", 180 pounds, and is right-handed. (R. 165). Plaintiff has completed high school and has no further educational or vocational training. (R. 166). Plaintiff lives in a house with his wife, who still works. (R. 166, 172).

Plaintiff began to have visual problems after taking steroid shots related to a surgery to remove a left eye cataract. (R. 168). The side effects of the steroids caused blurred vision in that eye. (R. 168-9). Plaintiff testified that glare or bright lighting makes the condition worse, describing the condition as similar to "looking through a piece of plastic . . . with cobwebs

---

[1] This examination was held after the decision of the ALJ (April 9, 2004), but before the Appeals Council's decision (June 3, 2005).

2

moving in there and stuff."  (R. 169).  Plaintiff's right eye has also developed inflammation, "cobwebs" and floaters (not as severe as in the left eye), as well as a cataract.  (R 169 - 170).  He testified that the cataract in his right eye was another side effect from the steroids, adding he had also been on steroid tablets two times after the initial shots.  (Id.)  The combination of symptoms in each eye has resulted in lack of depth perception.  (R. 170).  Plaintiff cannot read fine print with his left eye; the blurriness affects his near and far vision equally; he has to be within six feet of the television to make out any writing.  (R. 171).

Plaintiff's condition permits him to read and write, but "he has to stare right at [the page] and sometimes as the blurriness comes into that eye I have to wait for it to move . . . it will come and go."  (R. 170).  He only drives when he has to, but never at night, because his "left eye is totally gone at night."  (R. 171).

Plaintiff is currently taking Lumigan and Cosopt.  (R. 171).  The side effects from these two eye drops are minor – bloodshot eyes and a temporary burning sensation when the Cosopt is applied.  (R. 172).  About every six months he takes the steroid pills to reduce inflammation.  He avoids the shots because their side-effects were so strong.  (Id.)

Plaintiff spends his day watching TV and doing light housework.  (R. 172, 174).  He golfs in the summertime, but its getting harder for him to do so because he loses the ball in the brightness of the sky. (R. 173).  Currently, he can take care of his own personal grooming, pay bills, as well as help with light housework (making the bed, fixing light meals, and doing dishes).  (R. 174).  Sun reflecting off the snow in winter nearly blinds him.  His loss of vision affects his ability to cut grass because he is not able to see where he's already been.  (R. 176).  He has to put sunshades on his glasses and wears a hat when he goes outside; to prevent his eyes from

watering and his left eye from aching.  (Id.)

Plaintiff's depth perception affect his ease of walking, requiring special care when descending or climbing steps or curbs.  (R. 175).  He has problems playing catch with his grandson because he has trouble adjusting to the ball.  (Id.)

Plaintiff also testified that lifting and turning direction while carrying heavy things makes him dizzy and light-headed until his eyes "refocus in the direction I'm looking."  (R. 175 - 176). He does not attempt to pick up really heavy things because he is not sure of himself.  (R. 176).

### C.    MEDICAL EVIDENCE

#### 1.    EVIDENCE IN RECORD PRIOR TO ALJ'S APRIL 9, 2004 DECISION

From descriptions of the Plaintiff's condition in subsequent examination reports by Paul V. Raphelian, M.D., Sundhar R. Ramasamy, M.D. and Joseph L. Wilhelm, *infra*, Plaintiff complained of fogging or a "film" in his left eye, which was diagnosed as iridocyclitis/uveitis (also diagnosed as vitreitis in the patient histories) by Dr. Raphelian on November 11, 1998.  (R. 106, 89, 139).  At that initial visit in 1998, Dr. Raphelian also diagnosed early posterior subcapsular cataracts in both eyes.  (R. 139).  Beginning on January 6, 1999, Plaintiff underwent steroid therapy to that eye, including a subtenon steroid injection, which were tapered after a May 26, 1999, exam.  (R. 139).  Lawrence Hazen, D.O., on November 11, 1999, performed a posterior cataract removal from the left eye along with a lens implantation.  (R. 106, 139).

Plaintiff saw Dr. Hazen of the Andersen Eye Center on January 24, 2000, complaining of "fogging in the left eye" that was worse than after the surgery, although his overall vision had improved.  (R. 85).  Hazen found vitreous clouding partially caused by a "large amount of debris

4

from previous iridocyclitis" but no other problems.  Plaintiff's intraocular pressure was 17 OD (*oculus dexter*; right eye) and 18 OS (*oculus sinister*; left eye).  (Id.)  Dr. Hazen indicated that plaintiff's eyesight was fairly good and recommended no further treatment, stating "the treatment is worse than the disease."  (R. 86).

On October 25, 2001, Plaintiff saw Dr. Raphelian, who noted in his report that Plaintiff had told him he had seen a Dr. Shokoohi for a second opinion on the floaters in his left eye, but no additional surgery was recommended for this condition.  (R. 106).  Dr. Raphelian diagnosed recurrent versus chronic vitreitis, possible glaucoma, a mild epimacular membrane, and pseudophakia with anisometropia in his left eye, and a moderate, visually insignificant cataract in his right eye.  (R. 107).  Plaintiff's vision with glasses was 20/15 OD and 20/20 OS; his intraocular pressure was 17 OD and 20 OS.  (R. 106).  Raphelian recommended tests for "esoteric" causes such as Lyme disease and multiple sclerosis, and then treatment with topical steroids followed by subtenon steroid treatment for the vitreitis in the left eye.  (R. 107).  The test results received on November 24, 2001, were negative for esoteric causes.  (See R. 95 - 105; see also R. 120).

On November 12, 2001, Plaintiff saw ophthalmologist Sundhar R. Ramasamy, M.D., after being referred back to the Andersen Eye Center for treatment of his chronic vitreitis.  (R. 89).  He reported that Plaintiff's intraocular pressure was 20 and he had 20/20 vision with corrective lenses in both eyes.  (Id.)  Ramasamy found an epiretinal membrane in the left eye that he believed was probably the primary cause of Plaintiff's level of vision. (R. 90).   He also diagnoses chronic uveitis and chorioretinal scarring in the left eye, and a posterior subcapsular cataract in the right eye.  (Id.)  He also suspected glaucoma, based on an asymmetrical cup-to-

5

disk ratio asymmetry.  (Id.)

Dr. Ramasamy saw the Plaintiff again on December 11, 2001, (R. 92 - 93) reporting his findings on January 1, 2002, for Plaintiff's union disability pension.  (R. 94).  Both eyes had 20/20 vision with corrective lenses, (R. 92, 94), and Plaintiff had glaucoma, macular pucker, and chronic uveitis in his left eye.  (R. 94).  Dr. Ramasamy's January 1, 2002, report further indicated that the Plaintiff was not totally disabled, could perform any work not requiring fine stereoptic vision and could resume work at any time, as the condition was chronic and unlikely to change.[2]  (R. 94).

On January 14, 2002, Plaintiff saw Dr. Ramasamy, who recommended a treatment course of Predisone and Alphagan for the chronic uveitis.  (R. 110). At the visit, plaintiff complained of pain in his left eye, and getting dizzy in bright light.  (R. 109).  Plaintiff's vision was 20/20 OD and 20/25 OS.  (Id.)

On January 22, 2002, Plaintiff saw Dr. Hazen who observed that the Plaintiff was "in general good health," not able to see as well out of his left eye than his right at night, but he could "see his clock better out of the left than the right."  (R. 112).  Plaintiff's vision was 20/20 and his intraocular pressure was 22 in both eyes.  (Id.).  Dr. Hazen diagnosed chronic uveitis and cupping, open angle glaucoma, and recommended a switch from Alphagan to Lumigan.  (R. 113).

On January 29, 2002, Plaintiff saw Dr. Ramasamy, who indicated that he had maintained his 20/20 vision but lost some contrast sensitivity in his left eye, and that the Plaintiff had

---

[2] The Disability Pension was apparently denied initially because of problems deciphering Dr. Ramasamy's handwriting, (R. 121), but was subsequently granted.  (Plaintiff's Testimony, R. 166).

nyctalopia – poor night vision or night blindness.  (R. 117 - 119).  Plaintiff's intraocular pressure was 18 OD and 19 OS.  (R. 117).  Ramasamy recommended tapering the Prednisone because of its side effects, taking an MRI of his left eye to rule out "any mass or optic nerve disorder," and recommended against surgery to remove his epiretinal membrane because of Plaintiff's level of visual acuity.[3]  (R. 118).

On March 15, 2002, Plaintiff was seen by ophthalmologist Joseph L. Wilhelm, M.D.  (R. 139).  Dr. Wilhelm concluded that the Plaintiff had active uveitis or vitreitis in the left eye, glaucoma in the left eye, probably secondary to the vitreitis, and a posterior subcapsular cataract in the right eye.  (R. 141).  His vision was 20/40  in the left eye and 20/20 in the right in a darkened room, but worsened to 20/200 in left eye and 20/50 in the right in a low-contrast environment.  (R. 141 - 142).  Plaintiff's intraocular pressure was 20 for both eyes while on the Lumigan drops.  (R. 141).

Dr. Wilhelm stated that the Plaintiff would be able to function well in a work situation with high contrast, but his depth perception would "markedly decrease" and his visual acuity would "drop to the 20/50 to 20/200 range" in a work environment with a lot of glare or low contrast.  He further recommended that the Plaintiff "be restricted to well-lit situations with low glare and areas that do not require accuracy of placement of objects to within six inches."  (R. 142).  Dr. Wilhelm recommended taking Plaintiff off of Lumigan and putting him back onto Alphagan.  Dr. Wilhelm also suggested  a different treatment plan with surgeries to correct the capsule opacity, vitreous debris, and epiretinal membrane in the left eye, as well as the cataract in the right eye. (R. 143 - 144).

---

[3] The results of the MRI test, on January 31, 2002, were negative.  (R. 138).

7

When seen by Dr. Hazen on May 29, 2002, for reevaluation of his glaucoma and chronic uveitis, Plaintiff stated that he had been doing well, although he "had more redness than he would like" from the Lumigan.  (R. 123).  His vision was 20/20 OD, 20/25 OS on this visit, and his intraocular pressure was 16 in both eyes.  Dr. Hazen recommended no change in treatment, with a follow-up visit for glaucoma with David Duryea, M.D., and a return visit to himself in one year.  (R. 124).

On June 24, 2002, Plaintiff saw Dr. Ramasamy for a five-month reevaluation regarding his blurred vision.  (R. 126).  His vision was 20/25 in both eyes, and his intraocular pressure, 13 OD and 17 OS.  (Id.)  Dr. Ramasamy reported that the Plaintiff's chronic uveitis was stable with no evidence of progression and his glaucoma was stable on Lumigan.  (R. 127).  He recommended observation and reevaluation for the glaucoma in about six months; but, after reviewing Dr. Wilhelm's report, he recommended Plaintiff come back in a month to reevaluate the retina and posterior capsule opacity in his left eye.  Dr. Ramasamy stated that it appeared Plaintiff might benefits from a YAG capsulotomy and possibly an epiretinal membrane peeling.

Plaintiff applied for Title II disability on April 23, 2002.  In the Physical Residual Functional Capacity Assessment on July 2, 2002, state agency medical consultants found that the Plaintiff had no exertional, postural or manipulative limitations, (R. 148 - 149), but his vision problems limited him to work consistent with the recommendations of Dr. Wilhelm, and that he was to avoid all exposure to hazards such as machinery and heights.  (R. 151, 153).

Plaintiff was next seen by Dr. Ramasamy on August 27, 2002 for a follow-up examination for his chronic uveitis in his left eye and open angle glaucoma.  (R. 128, 131).  Since his last visit, Plaintiff denied having any visual acuity changes.  His vision was 20/25-3

8

OD and 20/25-2 OS, his intraocular pressure 15 OD and 19 OS. (R. 131). Dr. Ramasamy noticed "punched-out spots" on the periphery of Plaintiff's left retina. (R. 132). He assessed Plaintiff's open angle glaucoma was better managed with Lumigan than with the past Alphagan treatments; he added a Cosopt prescription for both eyes to lower the intraocular pressure further. (Id). Dr. Ramasamy and Plaintiff decided that because his status was "relatively stable" they would continue observation and avoid steroid therapy, which had produced adverse side effects for the Plaintiff in the past. Plaintiff decided to defer vitrectomy surgery and epiretinal stripping on the left eye to help clear his vision.

In a five-month checkup on January 27, 2003, Dr. Ramasamy noted Plaintiff's visual acuity remained 20/25 in both eyes; intraocular pressures were 10 OD and 15 OS. (R. 134). The Cosopt medication made Plaintiff's eyes itchy, but this was tolerable. (R. 133, 134). The chronic uveitis "appeared quiescent, and does not require any further management." (R. 134). The glaucoma in both eyes was stable, but the epiretinal membrane in the left eye still present. The punched-out spots remained on Plaintiff's left retinal periphery.

On July 28, 2003, Plaintiff saw Dr. Ramasamy, complaining that both eyes were getting worse. (R. 135, 137). Plaintiff's vision was 20/25 in both eyes, with an intraocular pressure of 16 OD and 15 OS. (R. 135). Dr. Ramasamy kept him on Lumigan and Cosopt, and prescribed a course of oral Prednisone for a week followed by a 7-10 day taper for the recurrence of uveitis. (R. 135, 137). Plaintiff visited Dr. Ramasamy on August 11, 2003, for a follow-up exam; Plaintiff was on the second-to-last day of his Prednisone. (R. 137). Plaintiff's visual acuity remained 20/25 in both eyes; Ramasamy measured "normal" intraocular pressures, 9 OD, 10 OS. (R. 137, 136). Plaintiff's spots in his left retinal periphery remained, but there were fewer

cells within his vitreous cavity than at the previous visit.  (R. 137).

Plaintiff saw Dr. Ramasamy again on November 11, 2003.  (R. 160).  His vision was 20/20 OD and 20/25 OS, and his intraocular pressure 14 OD and 18 OS.  Dr. Ramasamy's evaluation was that Plaintiff's chronic uveitis was at that time quiescent, and his glaucoma was managed with the Cosopt and Lumigan.  (R. 161).  He recommended that Plaintiff see Dr. Chopra for his glaucoma and scheduled a follow-up visit for six months.  (R. 160 - 161).

Also included in the record are charts from, but not a formal report of a March 15, 2004 vision examination at the Andersen Eye Center, likely done by Dr. Vikas Chopra. (R. 156 - 157). Plaintiff's assessment of his visual acuity was the "same – still blurry"; his vision was measured as 20/25-2 in both eyes, and his intraocular pressure 16 OD and 14 OS.  (R. 156).  The impressions of the examining physician seem to indicate Plaintiff's glaucoma in his left eye is "controlled", the cataract in his right eye should be "followed."  (R. 157).  The plan indicated no new prescriptions and a checkup three months hence.  (R. 156 - 157).

## 2. EVIDENCE INCLUDED WITH THIS CASE REVIEW

Exhibit A, attached and incorporated to the Plaintiff's Motion for Summary Judgment Brief, is a letter written by Dr. Ramasamy on December 3, 2004, after an examination on November 24, 2004.  Dr. Ramasamy stated that:

> [Plaintiff's] condition has resulted in significant difficulty with glare, particularly with his left eye. The condition has worsened since January of 2003. As a result, he may be unable to perform activities requiring fine visual acuity. Additionally, I would recommend that he not lift any objects greater than 20 pounds or work in any low lighting situations. Such activities may bring harm to himself or others near him. I would recommend that he only occasionally reach away from his body with his upper extremities.

10

(Plaintiff's Motion for Summary Judgment, Ex. A, Dkt. #11, Attachment 2).

### D. VOCATIONAL EVIDENCE

Vocational Expert ("VE") Ann Tremblay testified at the March 24, 2006, hearing that the Plaintiff's past relevant work as a crane operator was light, and skilled, with no transferable skills, and that the Plaintiff performed his job as defined in the *Dictionary of Occupational Titles*. (R. 178). ALJ Temin then asked the following hypothetical: An individual with the same age, education and work experience as the Plaintiff; the ability to lift, push, and pull up to 50 pounds occasionally and 25 frequently; the ability to perform occasional stooping, kneeling, crouching, crawling and climbing of ramps and stairs; no climbing of ramps and scaffolds; no operating automotive equipment or working at unprotected heights or around hazardous machinery; no outdoor work or work requiring depth perception; and with a need to work in a well-lit situation with low glare, in a job not requiring either accurate placement of objects or visual acuity within six inches. (R. 178 - 179). VE Tremblay stated that such an individual could not perform Plaintiff's past relevant work, but there were approximately 9,000 jobs available in the lower peninsula of Michigan to a hypothetical individual matching this description. These jobs included 3,000 laundry worker jobs; 4,000 cleaner jobs; and 2,000 packager jobs. (R. 179).

ALJ Temin modified this hypothetical to include an inability to perform work requiring clarity of vision at a distance of over six feet, and VE Tremblay responded that this would not affect the jobs listed; however, when the ALJ Temin added an inability to sustain vision over an eight-hour day, all employment was eliminated. (R. 180). Plaintiff's attorney added the

11

conditions of only occasionally being able to reach away from the body and only occasionally being able to rotate the head to the left and right, to ALJ Temin's initial hypothetical; VE Tremblay indicated that these limitations would eliminate the 9,000 available unskilled jobs.  (R. 180).

### E. THE ALJ'S DECISION

In an April 9, 2004, decision ALJ Temin concluded that the Plaintiff was not disabled within the meaning of the Social Security Act.  (R. 15 - 21).  He found Plaintiff had the severe impairments of chronic uveitis in his left eye, chronic open glaucoma in both eyes and an epiretinal membrane, left eye.  (R. 18, 20; see 20 CFR §§ 404.1520(c) and (d)(1)). Plaintiff's impairments, however, "were not severe enough" to meet or equal any impairment contained in Appendix 1, Part 404, Subpart P of the Regulations.  (R. 18, 21).  ALJ Temin found Plaintiff's testimony about his limitations to be credible and consistent with his assessed residual functional capabilities. (R. 19, 21).

ALJ Temin, accepting VE Tremblay's testimony, found Plaintiff unable to perform any of his past relevant work.  (R. 19, 21; see 20 CFR § 404.1565).  He found that the Plaintiff was of "advanced age," and had a "high school education."  (R. 19, 21; see 20 CFR § § 404.1563, 404.1564).  Based on VE Tremblay's testimony, ALJ Temin found that Plaintiff had no transferable skills from any past relevant work. (R. 19, 21).

ALJ Temin found Plaintiff had the residual functional capacity to perform a significant range of medium work.[4]  (R. 18, 20, 21; see 20 CFR § 404.1567). He found Plaintiff's limitations

---

[4]     "The undersigned finds that the claimant has no significant exertional limitations and can certainly perform a  range of medium work. He can lift 25 pounds frequently, 50 pounds occasionally."
ALJ Temin's April 9, 2004 Report.  (R. 18).

12

to prohibit him from the full range of medium work.[5]  (R. 18, 21).  However, "using Medical-Vocational Rules 203.22 and 203.15 as a framework for decision-making," as well as the testimony of VE Tremblay, ALJ Temin found that "there are significant numbers of jobs in the national economy he could perform," and Plaintiff was "capable of making a successful adjustment" to those jobs.  (R. 21, 20).  Thus, he found that the Plaintiff was not under a "disability," as defined in the Social Security Act, "at any time through the date of this decision." (R. 20, 21; see 20 CFR § 404.1520(f)).


## II. ANALYSIS

### A. STANDARDS OF REVIEW

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence.  See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Commissioner's findings are

---

[5]    "Due to his vision deficits, he should never climb ladders/ropes/scaffolds and should not operate automotive equipment. He should not work at unprotected heights or around hazardous machinery. The claimant can occasionally stoop, kneel, crouch, crawl and climb ramps and stairs. Due to the need to avoid glare, any work performed should be indoors and the work environment well lit, with low glare. Tasks required should not demand accuracy of placement within six inches or otherwise require visual acuity within six inches, and should not require clarity of vision at distances greater than six feet." ALJ Temin's April 9, 2004 Report.  (R. 18).

not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry their burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than their past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[6]  A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists that the Plaintiff can perform.

### B. FACTUAL ANALYSIS

Plaintiff challenges the Commissioner's decision, arguing that ALJ Temin relied on an inaccurate hypothetical question that failed to completely include all of Plaintiff's impairments, i.e., his difficulty lifting, moving, and twisting with heavy objects.  (Plaintiff's Motion for Summary Judgment, p. 7, Dkt. #11; R. 175).  Plaintiff has included a December 3, 2004, letter from his longtime treating physician, Dr. Ramasamy, highlighting Dr. Ramasamy's opinion that the Plaintiff's "condition", i.e., his "retinal problems as well as glaucoma", "has worsened since January 2003," and his recommendation that the Plaintiff should not "lift any objects greater than

---

[6] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

14

20 pounds." (Plaintiff's Motion for Summary Judgment, Ex. A, Dkt. #11, Attachment 2).

  Dr. Ramasamy's letter dated December 3, 2004 cannot be used to show that the ALJ's hypothetical was incomplete, because this evidence was not in the record prior to the hearing on March 26, 2004, or the ALJ's decision on April 9, 2004, nor was it submitted and considered by the Appeals Council before its June 3, 2005, decision.[7]  At the hearing, however, Plaintiff did testify as to his difficulty lifting heavy objects, in response to a question from his attorney.  (R. 175).  Plaintiff's attorney also proposed that plaintiff's vision problems, evinced during his description of his daily activities, would prevent him working a full eight-hour day.[8]

  It is correct that a hypothetical question must precisely and comprehensively set out every physical and mental impairment of the applicant that the ALJ accepts as true and significant.  *Varley v. Secretary of HHS*, 820 F.2d 777, 779 (6th Cir. 1987) ("Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question, but only 'if the question accurately portrays [plaintiff's] individual

---

[7] This evidence, even if submitted to the Appeals Council which then denied review, cannot be used to reverse the Commissioner's decision on appeal.  Although the circuits are split on this issue, see *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005), the Sixth Circuit in *Cotton v Sullivan,* 2 F.3d 692 (6th Cir. 1993), citing *Wyatt v. Secretary of Health & Human Servs.,* 974 F.2d 680 (6th Cir.1992), held that new, material evidence can be used to reverse a decision by the Commissioner only where the evidence was submitted to the the Appeal Council which decided to review the case in light of the new evidence because then the Appeals Council's decision is the one under review by the court. If, as is more common, the evidence was submitted to  the Appeal Council but it decides not to review the case, while the new evidence becomes part of the "administrative record" record, it is the ALJ's decision that is then under federal court review and the new evidence cannot be used to reverse a decision by the ALJ because it was not before the ALJ.  *Cotton,* 2 F.3d at 696, citing *Willis v. Secretary of Health & Human Servs.,* 727 F.2d 551, 553-54 (6th Cir.1984)( the record is closed at the administrative law judge level). Where a party presents new evidence on appeal to the Appeals Council that denies review or to the federal court for the first time, the Court can consider the evidence only to determine if a remand is appropriate under sentence six of 42 U.S.C. § 405(g) for further consideration of the evidence but only it the party seeking remand shows that the new evidence is material.

[8] ALJ Temin's second hypothetical to VE Tremblay did include visual problems precluding a eight-hour workday as an additional factor. (R. 180).

physical and mental impairments'"). But the ALJ may pose hypothetical questions to the VE that include only those limitations which the ALJ finds credible. *Casey v. Sec'y of HHS*, 987 F.2d 1230, 1235 (6th Cir. 1993).

In his credibility determination, the ALJ must "discuss[] the evidence, and stat[e] [the] determination and the reason or reasons upon which it is based" in his report. 42 U.S.C. § 405(b)(1). A claimant's statements about his symptoms and their effects on his ability to work cannot be rejected "solely because the available medical evidence does not substantiate [the claimant's] statements." 20 C.F.R. § 404.1529(c)(2); see 20 C.F.R. § 416.929(c)(2). The ALJ cannot determine credibility of the claimant's testimony about his symptoms and functional limitations without some analysis. *Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994). Under either the Regulations 20 C.F.R. § 404.1529 and the framework outlined in *Felisky* and other Sixth Circuit Cases, the weight given "pain or other symptoms" in this determination follows a two-step process, wherein (1) the relations of the severity of the alleged symptoms to objective medical evidence and (2) the limits the symptoms place on work activities are evaluated.[9] *See also* Social Security Ruling 96-7p. ALJ Temin took appropriate note of the evaluative criteria from the Regulations. (R. 18 - 19).

In terms of ALJ Temin's failure to give weight to Plaintiff's testimony regarding his inability to work an eight-hour day because his vision problems (e.g., the intermittent blurriness

---

[9] *Duncan v. Secretary of Health & Human Services,* 801 F.2d 847, 853 (6th Cir.1986): First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

16

and poor depth perception in low-contrast environments) and failure include it in his first hypothetical, ALJ Temin stated in his report that "although the claimant has well-documented chronic vision impairment, no physician has suggested work preclusive limitations due to his vision effects." (R. 19).  ALJ Temin found "the claimant's own description of his limitations is also essentially consistent with the residual functional capacity assessed."  (R. 19).  This is consistent with a finding that the Plaintiff's own testimony describing his symptoms and limitations as well as his daily activities did not exceed in severity the medical opinions of his doctors, so no additional weight was or should be given to his testimony.

ALJ Temin's non-inclusion in either of his two hypotheticals of Plaintiff's alleged inability to lift and carry heavy objects is also supported by the analysis in his report.  No medical opinions on any "work-preclusive limitations" caused by an inability to pick up and carry heavy objects are noted in the record.  (R. 19).  Also a reasonable fact finder could interpret that the Plaintiff's testimony indicated that his visually related lifting limitation, consistent with his vision problems in low-contrast environments, occurs when he is outside.[10] (R. 175 - 176).  This would not be inconsistent with the limitations to "well-lit", "low glare" indoor work in ALJ Temin's hypothetical to VE Tremblay.  Finally, although the alleged difficulties in lifting heavy

objects are not directly discussed in ALJ Temin's report, an ALJ is not required to evaluate in

---

[10]  Immediately after testifying to his need for special care with curbs when "out in parking lots," he was asked about lifting and carrying. His response was, "If I do pick heavy stuff up I notice when I've got it up and I'm hanging onto it that if I try to, like it makes me more dizzy when I turn to look *if I'm, you know, out* I'll tend to get a little light-headed, dizziness, until my eyes refocus in the direction I'm looking."  (Emphasis supplied) (R. 175 - 176). He added "Other than that, as far as lifting, I guess that, that about the extent on the lifting").  (R. 176).  This leads to a reiteration of his problems with the sun "when I go out."  (Id.).

writing every piece of testimony.  See *Anderson v. Bowen*, 868 F.2d 921, 924 (7th Cir. 1989)

("Instead, we are interested in knowing that the Secretary has considered and discussed the

important evidence, including all medical evidence that is credible, supported by clinical

findings and relevant to the question at hand." (citations and internal quotation marks omitted)).


Regarding Plaintiff's argument that he should be deemed disabled as of his 55th birthday

when he became of advanced age, he is correct that if he were limited to light work, he would be

deemed disabled under grid Rule 202.06 as of his 55th birthday.   But ALJ Temin found Plaintiff

capable of a limited range of medium work, and used grid Rule 203.22 for periods before his 55th

birthday and grid Rule 203.15 for periods after his 55th birthday. (R. 21)  As noted above, there is

substantial evidence to uphold a finding that Plaintiff can perform a limited range of medium

work, and thus grid Rule 202.06 is not binding on the Commissioner, and the ALJ's decision

should be upheld.

Regarding an issue not raised by Plaintiff's counsel, new evidence can be used to remand

a case back to the Commissioner for further consideration under sentence six of 42 U.S.C. §

405(g).[11]  Such evidence to warrant a remand should be (1) new, (2) material, and (3) there

should be a showing of good cause for a party's failure to include it in the record.  42 U.S.C. §

405(g); see, e.g., *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993).

---

[11] Sentence six of 42 U.S.C. § 405(g) provides:

"The court . . .  may at any time order additional evidence to be taken before the Commissioner of Social
Security, but only upon a showing that there is new evidence which is material and that there is good
cause for the failure to incorporate such evidence into the record in a prior proceeding."
42 U.S.C. § 405(g).

"[I]t is well established that the party seeking remand bears the burden of showing that a remand is proper under Section 405." *Oliver v. Secretary of Health & Human Services*, 804 F.2d 964, 966 (6th Cir. 1986) (citing *Willis v. Secretary of Health and Human Services*, 727 F.2d 551 (6th Cir. 1984)).

Here the new evidence consists of a seven sentence letter from Plaintiff's treating physician, Dr. Ramasamy, written on December 3, 2004,  following an examination of the Plaintiff on November 24, 2004.  (Plaintiff's Motion for Summary Judgment, Ex. A,  Dkt #11, Attachment 2).  No charts or reports from the November 24, 2004, examination have been included in the record.  The relevant evidentiary portions of  Dr. Ramasamy's December 3, 2004, letter are as follows: (1) Plaintiff's condition has worsened since January 2003, and (2) Dr. Ramasamy's recommends that the Plaintiff should not lift any objects greater than 20 pounds, and (3) Plaintiff should not work in any low lighting situations and (4) he may be unable to perform activities requiring fine visual acuity. Only (2), (3) and (4) are vocationally significant limitations.  It appears that the first two items – (1) and (2) –  are new to the record; items (3) and (4) are not new, because they were considered and were adequately accommodated in ALJ Temin's hypothetical. (R. 179).  Thus, only the weight limitation of 20 pounds has vocational effects that are "new" and were not included in ALJ Temin's hypothetical.

While there is some confusion in the Sixth Circuit, the prevailing trend is to interpret the materiality standard as being a reasonable possibility that the Commissioner's decision would be different if the new evidence were included.[12]  The materiality of the only matters not

---

[12] In *Sizemore v. Secretary*, 865 F.2d 709, 711 (6th Cir. 1988), the Sixth Circuit discusses the materiality standard of § 405(g):

already accommodated in the VE hypothetical  – first and second portions noted above from the

brief and conclusory December 3, 2004, letter – are  not self-evident.  It is unclear if  worsened

"condition" refers to Plaintiff's "retinal problems," or glaucoma, or perhaps the unmentioned

uveitis.  Reports from several examinations subsequent to January 2003, seem to indicate

Plaintiff's condition to be relatively stable.  (R. 134, 135 - 137, 160 - 161, 156 -157).

The  recommendation against lifting objects over 20 pounds, although given by

Plaintiff's treating physician, is unexplained and unsupported by medical evidence in the record.

*See* 20 C.F.R. § 404.1727(d)(3); *Warner v. Commissioner of Social Security*, 375 F.3d 387, 390

(6th Cir. 2004).   Does it relate to Plaintiff's visual impairment or another physical impairment on

a condition not treated by Dr. Ramasamy?  If this evidence refers to a worsened condition and

greater lifting restrictions that began after the date of the ALJ Temin's opinion, as it appears they

do, the Appeals Council would not remand the case had this data been submitted to it, as it could

have been, because the Appeals Council only considers evidence "new and material" to the prior

---

In order for the claimant to satisfy this burden of proof as to materiality, he must
demonstrate that there was a reasonable probability that the Secretary would have
reached a different disposition of the disability claim if presented with the new evidence.
*See Caroll v. Califano*, 619 F.2d 1157, 1962 (6th Cir. 1980); *see also Ward v. Schweiker*,
686 F.2d 762, 764-65 (9th Cir. 1982); *Chaney v. Schweiker*, 659 F.2d 676, 679 (5th Cir.
1981).

865 F.2d at 711.
It is clear from reading *Sizemore* that the issue of the definition of "materiality" was not before the Sixth
Circuit in that case.  It also appears that the Sixth Circuit in *Sizemore* misstates the actual law in this and
other circuits.  None of the cases that it cites support the proposition that the materiality standard requires
that there must be a "reasonable probability" of a different outcome.  The case law focusing on this
specific issue, including the *Chaney* case cited by *Sizemore*, makes it clear that a lower standard of
"reasonable possibility," and not "reasonable probability" applies for considering the materiality standard
under 42 U.S.C. § 405(g).  *See Chaney v. Schweiker*, 659 F.2d 676, 679 (5th Cir. 1981) ("Thus we hold
that a remand to the Secretary is not justified if there is no reasonable possibility that it would have
changed the outcome of the Secretary's determination."); *Godsey v. Bowen*, 832 F.2d 443, 444 (7th Cir.
1987); *Hyde v. Bowen*, 823 F.2d 456, 459 (11th Cir. 1987); *Milano v. Bowen*, 809 F.2d 763, 766 (11th
Cir. 1987); *Booz v. Secretary*, 734 F.2d 1378, 1380-81 (9th Cir. 1984); *Dorsey v. Heckler*, 702 F.2d 597
(5th Cir. 1983).

decision if it relates to periods before the date of the ALJ's hearing decision.  20 C.F.R. § 404.970(b).

Even if the issue of materiality of the evidence were resolved in favor of Plaintiff, sentence six of 42 U.S.C. § 405(g) requires the moving party to make a showing of good cause as to why the evidence was not included in the record.  *See, e.g.*, *Willis*, 727 F.2d at 554 ("this court may remand the case only when . . . good cause is shown for failure to incorporate such evidence into the prior proceeding").  Evidence that becomes available after the ALJ's decision but before the Appeal Council's ruling should be proffered to the Appeals Council; a reason as to why it was not proffered should be given if it is to be used on appeal.  *See Waite v. Bowen*, 819 F.2d 1356, 1361-1362 (7th Cir. 1987).  In this case, Plaintiff had seven months to offer Dr. Ramasamy's December 3, 2004, letter to the Appeals Council prior to its decision on June 3, 2005.

Given the fact that two of the three vocationally significant concerns of Dr. Ramasamy's were taken into account in ALJ Temin's hypothetical question (no low lighting situations and no fine visual acuity), and given the reluctance of the Commissioner to credit conclusory statements on exertional and other impairments without adequate explanation and/or supporting clinical or medical diagnostic evidence, as well as the likely inability to demonstrate "good cause" for not proffering Dr. Ramasamy's letter to the Appeals Council, this letter does not warrant a remand under sentence six of 42 U.C.S. § 405(g).

## III.   RECOMMENDATION:

Accordingly, for the above stated reasons IT IS RECOMMENDED that Defendant's motion for Summary Judgment be GRANTED and Plaintiff's Motion for Summary Judgment be DENIED.

The parties to this action may object to and seek review of this report and recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985);  *Howard v. Sec'y of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this report and recommendation. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge. Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: June 29, 2006                         s/Steven D. Pepe
Ann Arbor, Michigan                          UNITED STATES MAGISTRATE JUDGE

Certificate of Service

I hereby certify that a copy of this Order was served upon the attorneys and/or parties of record by electronic means or U. S. Mail on June 29, 2006.


s/Deadrea Eldridge
Courtroom Deputy Clerk

23